JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

County in which action arose __Macomb__

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CLIFTON ROE

## DEFENDANTS
NANO GAS TECHNOLOGIES, INC.

**(b)** County of Residence of First Listed Plaintiff __Macomb__
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant __Macomb__
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Donald C. Darnell P55268
7926 Ann Arbor St.
Dexter, Michigan 48130  734-424-5200

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☐ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☒ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
       & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
       Student Loans
       (Excludes Veterans)
☐ 153 Recovery of Overpayment
       of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
       Liability
☐ 320 Assault, Libel &
       Slander
☐ 330 Federal Employers'
       Liability
☐ 340 Marine
☐ 345 Marine Product
       Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
       Product Liability
☐ 360 Other Personal
       Injury
☐ 362 Personal Injury -
       Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury -
       Product Liability
☐ 367 Health Care/
       Pharmaceutical
       Personal Injury
       Product Liability
☐ 368 Asbestos Personal
       Injury Product
       Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
       Property Damage
☐ 385 Property Damage
       Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
       Accommodations
☐ 445 Amer. w/Disabilities -
       Employment
☐ 446 Amer. w/Disabilities -
       Other
☐ 448 Education

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure
       of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards
       Act
☐ 720 Labor/Management
       Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical
       Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement
       Income Security Act

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate
       Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee -
       Conditions of
       Confinement

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration
       Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal
       28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff
       or Defendant)
☐ 871 IRS—Third Party
       26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and
       Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/
       Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information
       Act
☐ 896 Arbitration
☐ 899 Administrative Procedure
       Act/Review or Appeal of
       Agency Decision
☐ 950 Constitutionality of
       State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
      Proceeding

☐ 2 Removed from
      State Court

☐ 3 Remanded from
      Appellate Court

☐ 4 Reinstated or
      Reopened

☐ 5 Transferred from
      Another District
      *(specify)*

☐ 6 Multidistrict
      Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Action for injunction relief in regard to technology known to a joint venture.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

DEMAND $ 2,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
September 30, 2014

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# PURSUANT TO LOCAL RULE 83.11

1.      Is this a case that has been previously dismissed?      ☐ Yes
                                                                ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.      Other than stated above, are there any pending or previously      ☐ Yes
        discontinued or dismissed companion cases in this or any other    ☒ No
        court, including state court? (Companion cases are matters in which
        it appears substantially similar evidence will be offered or the same
        or related parties are present and the cases arise out of the same
        transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
DETROIT

CLIFTON ROE,                                              Case No.
        Plaintiff,

-vs-

NANO GAS TECHNOLOGIES, INC.,
        Defendant.

Don Darnell P55268
7926 Ann Arbor St.
Dexter, Michigan 48130
734-424-5200
dondarnell@darnenll-law.com

## COMPLAINT FOR INJUNCTION RELIEF

Now comes the Plaintiff, Clifton Roe, by and through his attorney, Don Darnell, who

states for his complaint:

### Jurisdiction and Venue

1.     Plaintiff seeks a judgment enjoining the Defendant, its officers, employees, and agents from

using, disseminating, or making application for a patent to the United States Patent and

Trademark Office on the Technology as set forth herein in which Plaintiff is the inventor.

2.     This Court has jurisdiction over these claim pursuant to 28 U.S.C. §1332 because the amount

in controversy exceeds $75,000 and the parties are citizens of different states. This Court has

supplementary jurisdiction pursuant to 11 U.S.C. §1337 and 11 U.S.C. §1338.

3.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. §1391 because a

substantial part of the events or omissions giving rise to the subject claims arose in this

district.

**The Parties**

4.      Plaintiff Clifton Roe is an individual residing in Harrison Township, Macomb County, Michigan.

5.      Defendant Nano Gas Technologies, Inc. is a foreign corporation, organized and existing under the laws of the State of Delaware, with offices in Clinton, Macomb County, Michigan.

**Common Allegations**

6.      On or about March 21, 2013, Plaintiff, Clifton Roe (hereafter "Roe") and Defendant, Nano Gas Technologies, Inc. (hereafter (Nano Gas), signed an agreement titled "Collaboration and Non-Compete Agreement" (hereafter referred to as "the Agreement"). Said "Collaboration and Non-Compete Agreement is attached as Exhibit A. The effective date of the Agreement is February 16, 2013.

7.      The Agreement provides that disputes between the parties shall be resolved by mediation and then arbitration. (Collaboration and Non-Compete Agreement, p. 3, ¶ 15.). However, the Agreement further provides that either party may seek injunction relief in any court of competent jurisdiction. Deferring to the Agreement and its stated requirement to mediation and then arbitrate claims, Plaintiff complaint as follows pleads the facts of a contract void for want of consideration and default for material breaches of the Agreement by Nano Gas, but only requests injunction relief.

8.      As set forth in the Agreement, Roe invented a new technology that dissolves or disperses gasses into liquids which stay dissolved or dispersed at standard temperature and pressure which would modify Henry's Law. Roe's technology is further referenced in the Agreement as "the Technology."

9.      The Technology was invented by Roe prior to the Effective Date of the Agreement.

10.     As set forth in the Agreement, Roe "assigns all of his rights, title and interest in and to intellectual property relating in any way to the Technology to Nano Gas." (Collaboration and Non-Compete Agreement, p. 2, ¶ 10.)

11.     In consideration for said assignment, the Agreement describes "In exchange for the above consideration,...." (Collaboration and Non-Compete Agreement, p. 2, ¶10.)

12.     The Agreement fails to identify consideration, described only as "the above consideration." (Collaboration and Non-Compete Agreement, p. 2, ¶10.)

13.     Alternatively, in the even the "above consideration" is intended to described paragraphs in the Agreement preceding paragraph 10, no consideration was received by Roe as set forth in paragraphs 1 through 9 of the Agreement.

   a.      ¶ 1 "Inclusion of the Above" - No consideration to Roe is described in the preamble to the Agreement.

   b.      ¶ 2 "Joining the Team" - No consideration to Roe is described in paragraph 2.

   c.      ¶ 3 "Noncompete Covenant"- No consideration to Roe is described in paragraph 3.

   d.      ¶4 "Payment" - Roe was to receive a salary on the earlier of two conditions. No consideration was made in Paragraph 4 to Roe on the date of the contract.

   e.      ¶5 "Disability" - Disability insurance was to be provided to Roe and employees on a condition precedent. No consideration was made in Paragraph 5 to Roe on the date of the contract.

   f.      ¶6 "Employment Agreement" - Provides the parties may elect to enter into an employment agreement. No consideration was made in Paragraph 6 to Roe on the

date of the contract.

g.    ¶7 "Board Seat" - Grants Roe a board seat on Nano Gas board of directors. No board seat was given to Roe, and he has never been invited or attended a board of directors meeting.

h.    ¶8 " Use of Funding" - Provides priorities for Nano Gas funds. No consideration was made in Paragraph 8 to Roe on the date of the contract.

i.    ¶9 "Assignment" - Provides mechanism to reconvey the Technology back to Roe in case of change of control, default or dissolution of Nano Gas. No consideration was made in Paragraph 9 to Roe on the date of the contract.

14.    In that there was no consideration provided to Roe by Nano Gas in the Agreement, the contract is void for want of consideration.

15.    Plaintiff sets forth the following claim for breach of contract, in the alternative to his claim that the contract between Plaintiff and Defendant is void for want of consideration.

16.    Plaintiff incorporates by referenced preceding paragraphs 1 through 15.

17.    As set forth in the Agreement, Nano Gas is required to pay Roe a $125,000 annual salary beginning on the sooner of when "(I) when the company raises adequate capital, or (ii) one year following the creation of a working production machine." (Collaboration and Non-Compete Agreement, p. 1-2, ¶ 4.)

18.    On or before August 1, 2013, Roe created a "working production machine" as described in the Agreement.  (Collaboration and Non-Compete Agreement, p. 1-2, ¶ 4.)

19.    Nano Gas has failed and refused to pay Roe monthly salary payments as agreed. Failure to pay Roe's salary is a material breach of the Agreement. (Collaboration and Non-

Compete Agreement, p. 1-2, ¶ 4.)

20.     As set forth in the Agreement, Roe was to hold an initial seat on the Board of Directors of

        Nano Gas.  (See Collaboration and Non-Compete Agreement, p. 2, ¶ 7.)

21.     Roe has been invited to a single Board of Directors meeting.  Nano Gas has failed and

        refused to allow Roe to participate as director of the Nano Gas board of directors.

        Defendant's failure and refusal is a material breach of the Agreement.

22.     As set forth in the Agreement, Nano Gas founder were required to contribute "initial start

        up capital" adequate to at least "cover out of pocket expenses and build an initial demo

        machine." (Collaboration and Non-Compete Agreement, p. 1 and p. 2, ¶ 8.) Nano Gas

        was also required to "raise additional capital to support a laboratory...." (Collaboration

        and Non-Compete Agreement, p. 2, ¶ 8.)

23.     Nano Gas failed and refused to pay critical vendors to the joint venture, including

        consultant Linda Swieitzer, PHD; Oakland University (laboratory work); Bill Livingston.

        (Eaton computer programmer); Galco, (industrial electronics supplier); and Verizon.

        Failure to pay vendors is a material breach of the Agreement. (Collaboration and Non-

        Compete Agreement, p. 2, ¶ 8.)

24.     As set forth in the Agreement, Roe is the inventor of the Technology, using his "know

        how, designs, or inventions encompassed in the Technology." (Collaboration and Non-

        Compete Agreement, p. 2, ¶ 10.)

25.     Upon information and belief, Nano Gas applied to the United States Patent and

        Trademark Office (USPTO) for a provisional patent for the Technology.  The provisional

        patent application number is Nano Gas US Provisional Patent No. 61/904755.   11 U.S.C.

§115 requires an inventor to submit an oath that "(1) the application was made or was authorized to be made by the affiant or declarant; and (2) such individual believes himself or herself to be the original inventor or an original joint inventor of a claimed invention in the application."

26.    With regard to the provisional patent application, Roe has not seen nor has he signed any patent application filed with the USPTO by Nano Gas or any power of attorney allowing Nano Gas to file a patent application on his behalf. As of the date of this complaint, Roe has not seen Nano Gas US Provisional Patent No. 61/904755.

27.    Roe has requested from Nano Gas a copy of Nano Gas US Provisional Patent No. 61/904755, and Nano Gas has failed and refused to provide Roe with a copy of said provisional patent.

28.    Nano Gas has materially breached the Agreement in its failure to identify Roe as the inventor of the technology, failure to allow Roe to review the provisional patent application, and failing to allow Roe to sign the provisional patent application under oath, and further Nano Gas is in material breach for its fraudulent and unauthorized filing of NanoGas US Provisional Patent No. 61/904755.

29.    As set forth in the Agreement, "In the event of a change in control, default, or dissolution of Nano Gas, Cliff or his designee, will receive a payment of $100,000 per year for each year he has worked with Nano Gas on the Technology." (Collaboration and Non-Compete Agreement, p. 2, ¶10).

30.    On September 10, 2014, Roe advised Nano Gas that it was in material breach of the Agreement, setting forth detailed reasons for said breach, and demanded return of the

Technology as set for the in p.2, ¶10 of the Agreement. Said paragraph requires Nano Gas to pay Roe $100,000 "per year for each year he has worked with Nano Gas on the Technology." (Collaboration and Non-Compete Agreement, p. 2, ¶10). Pursuant to paragraph 10 of the Agreement, Roe is owed a pro-rated amount of $170,000.

31. On September 16, 2014, Nano Gas responded to Roe's letter of September 10, 2014, only to deny, without explanation, a breach of the agreement by Nano Gas.

32. The Agreement further provides that if Nano Gas should fail to pay the $100,000 per year payment, then Roe shall have to the right to "request or defer assignment" and that request shall not be unreasonably denied. (Collaboration and Non-Compete Agreement, p. 2, ¶10).

33. On September 23, 2014, Roe requested the to defer the assignment of the Technology.

34. As of the date of this complaint Nano Gas has not responded to Plaintiff's request.

35. Nano Gas's failure to pay the $100,000 per year payment, or to grant Plaintiff's request to defer the assignment of the Technology, is a material breach of the Agreement.

36. Plaintiff has and will be damaged by Defendant's actions and omissions, including unpaid salaries and payments, liability for unpaid vendors, lost opportunities, and impairment of Plaintiff's rights as the inventor of the Technology in filings made with the USPTO.

37. Upon information and belief, Nano Gas intends to file a patent as the assignee of the Technology.

38. Upon information and belief, Nano Gas intends to manufacture and offer for distribution, lease, and/or sale machines incorporating the Technology which belongs to Plaintiff.

39. As a direct and proximate result of Defendant's actions and omissions, Plaintiff has

suffered, and will continue to suffer, injury and substantial harm.

Wherefore, Plaintiff seeks the following injunctive relief:

a.    An order enjoining Defendant, its officers, employees, and agents from making

      any application for the Technology to the USPTO.

b.    An order enjoining Defendant, its officers, employees, and agents from

      disseminating the Technology;

c.    Costs and attorney fees as required to bring this action; and

d.    Any other and further relief as the circumstances may require and as the Court

      may deem just and proper.

September 30, 2014                          Respectfully submitted,

                                            Don Darnell P55268
                                            7926 Ann Arbor St.
                                            Dexter, Michigan 48130
                                            734-424-5200
                                            dondarnell@darnell-law.com

# COLLABORATION AND NON-COMPETE AGREEMENT

This Collaboration and Non-Compete Agreement (this "Agreement") is made effective as of February 16, 2013, by and between Nano Gas Technologies, Inc. ("Nano Gas") of 655 Deerfield Rd., Suite 100-140, Deerfield, Illinois 60015, and Cliff Roe, of 38020 Hazel, Harrison Township, Michigan 48045 ("Cliff").

Whereas Cliff and Nano Gas are each interested in collaborating jointly with each other to commercialize technologies for dissolving or dispersing gasses into liquids as well as other technologies for environmental remediation and other applications as well as additional technologies which the parties may invent (collectively "Collaboration").

Whereas Nano Gas, through its founders, are a group of business and technology professionals (the "Team") skilled in collaborating to commercialize technology solutions including, but not limited to, solutions for dissolving gasses into liquids. The Team has identified opportunities in multiple industries both globally and in the U.S. These opportunities include, but are not limited to, treatment of waste water, environmental remediation, food, agriculture, pharmaceutical, and others. Each member of the team will contribute initial startup capital in the creation of Nano Gas.

Whereas Cliff has invented and tested new technologies including, without limitation, a core technology that dissolves or disperses gasses into liquids which stay dissolved or dispersed at standard temperature and pressure which would modify Henry's Law (the "Technology"). Henry's Law postulates that a maximum amount of a gas can be dissolved in a liquid and that this only changes with temperature changes and/or pressure changes. Nano Gas and an independent lab have confirmed that Cliff has dissolved or dispersed oxygen into water at 400% to 500% greater amounts than the maximum postulated by Henry's Law.

For good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agrees as follows:

1. **INCLUSION OF THE ABOVE.** The above mentioned paragraphs are incorporated into this agreement.

2. **JOINING THE TEAM.** Cliff agrees to join the Team and shall contribute his intellectual property and know how relating, pertaining to or touching upon the Technology. This intellectual property embodied in the Technology includes, but is not limited to, technology for dissolving gasses into liquids, creating a machine for this purpose, and other devices for treating water, other applications and/or furthering the basic science. The Team will work together with respect to the possibility of sales, marketing, manufacturing, distribution, services, and capital funding for Nano Gas (a "Proposed Transaction") and in connection therewith will enter into confidential discussions, negotiations and/or agreements involving such Proposed Transaction (a "Business Purpose"). In order to pursue the Proposed Transaction, each Party as a Disclosing Party will be disclosing certain confidential information to the other Party a Receiving Party. The parties therefore recognize the need to maintain the confidentiality of such information from unauthorized use and disclosure, by or to any third party, without the prior written consent of Nano Gas.

3. **NONCOMPETE COVENANT.** For a period of the greater of:
   a. six (6) months (Initial Term), or
   b. while Cliff continues to receive a salary, and for four (4) months thereafter, whichever is longer;
   after the effective date of this Agreement, Cliff will not directly or indirectly engage in any business that competes with Nano Gas in the U.S. or worldwide. During the Initial Term, Nano Gas will make good faith efforts to raise capital needed to fund start up of the company, build demo machines, establish a laboratory for Cliff, and pay salaries.

4. **PAYMENT.** Nano Gas will pay an annual salary of at least $125,000 payable on a monthly or more frequent

EXHIBIT
A

Initialed ___ CR

basis on the sooner of; (i) when the company raises adequate capital, or (ii) one year following the creation of a working production machine. No other owner or employee of Nano Gas will receive compensation prior to Cliff. In addition, Cliff or another legal entity (such as a trust for his benefit) he designates shall receive 20% ownership interest in Nano Gas. This ownership percentage will be subject to dilution on a pro-rata basis with all other common owners. Finally, when Nano Gas offers health benefits to its employees, it will either provide those benefits for Cliff, or provide alternative compensation enabling Cliff to pay for health benefits from a family member's plan. *Cliff is eligible for salary increases as overall management salaries increase.* 

5. **DISABILITY.** Upon raising adequate capital, Nano Gas will provide benefits for all employees including disability insurance. Ownership in Nano Gas will not be impacted by disability. All or portions of this clause may be overridden by the Articles of Incorporation once they are signed by both parties.

6. **EMPLOYMENT AGREEMENT.** Cliff and Nano Gas may elect to create and sign an employment agreement. Should the parties execute such agreement; the employment agreement will control any items that don't agree with this agreement.

7. **BOARD SEAT.** Cliff will be granted an initial seat on the Board of Directors for Nano Gas and will continue to hold a seat as long as Nano Gas has two original owner representatives on its Board.

8. **USE OF FUNDING.** Nano Gas will use initial founder investment to cover out of pocket expenses and build an initial demo machine. Subsequently, Nano Gas will raise additional capital to support a laboratory for use by Cliff. The remaining capital will be used to pay salaries and other uses at the company discretion.

9. **MACHINE DESIGN.** As CTO, Cliff will be primarily responsible for machine design and will be consulted with in respect to any changes of the design of the machine.

10. **ASSIGNMENT.** Cliff shall be named as the inventor for any patents filed using his know how, designs, or inventions encompassed in the Technology. In exchange for the above consideration, Cliff hereby assigns all of his rights, title and interest in and to intellectual property relating in any way to the Technology to Nano Gas. Cliff shall execute any and all documents that counsel for the company requires to evidence and effectuate such assignment. In the event of a change in control, default, or dissolution of Nano Gas, Cliff or his designee, will receive a payment of $100,000 per year for each year he has worked with Nano Gas on the Technology. In the event that this payment is not made, Cliff or his designee shall have the right to request or defer assignment of the intellectual property which he has developed. Such request shall not be unreasonably denied.

11. **TERMINATION.** Nano Gas may only terminate Cliff for cause. "Cause" in this agreement means:
    a. an intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of Cliff's employment with Nano Gas;
    b. intentional damage to Nano Gas assets;
    c. intentional disclosure of Nano Gas's confidential information contrary to Nano Gas policies;
    d. breach of Cliff's obligations under this agreement;
    e. intentional engagement in any competitive activity which would constitute a breach of Cliff's duty of loyalty or of Cliff's obligations under this agreement;
    f. intentional breach of any of Nano Gas's policies;
    g. the willful and continued failure to substantially perform Cliff's duties for company (other than as a result of incapacity due to physical or mental illness); or,
    h. willful conduct by Cliff that is demonstrably and materially injurious to company, monetarily or otherwise.
For purposes of this paragraph, and act, or a failure to act, shall not be deemed willful or intentional, as those terms are defined herein, unless it is done, or omitted to be done, by Cliff in bad faith or without a reasonable

Initialed *JB CR*

belief that Cliff's action or omission was in the best interest of company. Failure to meet performance standards or objectives, by itself, does not constitute "Cause ". "Cause" also includes any of the above grounds for dismissal regardless of whether company learns of it before or after terminating Cliff's employment.

12. **CONFIDENTIALITY.** Cliff will not at any time or in any manner, either directly or indirectly, use for the personal benefit of Cliff, or divulge, disclose, or communicate in any manner any information that is proprietary to Nano Gas or relates to the Technology. Cliff will protect such information and treat it as strictly confidential; and not disclose it to any third party without the written consent of the company. Nano Gas hereby consents to Cliff's pre-existing non-disclosure agreements with Galco Industrial Electronics, Inc. and Eaton Corporation covering machine and electronic design work for the Technology. The obligation of Cliff not to disclose confidential information shall continue for a period of 5 years after the effective date of this Agreement. Within 30 days after receiving a written request, Cliff will return to Nano Gas all records, notes, documentation and other items that were used, created, or controlled by Cliff relating in any way to the Technology.

13. **ENTIRE AGREEMENT.** This Agreement contains the entire agreement of the parties regarding the subject matter of this Agreement, and there are no other promises or conditions in any other agreement whether oral or written. Future additions to this agreement are contemplated and must be approved in writing by Cliff and the board of directors.

14. **SEVERABILITY.** The parties have attempted to limit the non-compete and confidentiality provisions so that they apply only to the extent necessary to protect legitimate business and property interests of Nano Gas and each party agrees they are reasonable under the circumstances. If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If however a court finds that any provision of this Agreement is invalid or unenforceable, as written but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced so as to be limited and enforceable. Both parties expressly acknowledge and agree that such provisions are intended by them to be binding and that but for such provisions they would not have engaged in the activities described in this Agreement.

15. **DISPUTE RESOLUTION.** Any dispute arising out of or relating to this Agreement, including its formation ("Dispute") shall be resolved by mediation and then arbitration in the following manner; provided, however, that injunctive relief may be sought in any court of competent jurisdiction with respect to Sections 2, 3, 8 and 9, which relief may be effective during the pendency of proceedings brought pursuant to this Section 12. The Party raising the Dispute shall initiate mediation by giving a notice to all other Parties to the dispute ("Dispute Notice") not later than twenty (20) days after the date of the Dispute arising; such Dispute Notice shall include a detailed written description of the Dispute and propose one (1) or more resolutions thereof. Not later than ten (10) days after receipt of a Dispute Notice, the Party receiving the Dispute Notice shall give a notice ("Response Notice") to the Party issuing the Dispute Notice; such Response Notice shall include a detailed response to the Dispute Notice and propose one (1) or more resolutions thereof. Not later than fifteen (15) days after the giving of a Response Notice, the representatives of the Parties shall meet to discuss the Dispute Notice and Response Notice, and shall use their good faith, reasonable and best efforts to resolve the Dispute not later than ten (10) days after such meeting commences, which resolution, if reached, shall be binding on the Parties to the Dispute (collectively, a "Mediated Resolution"). If a Mediated Resolution does not occur with respect to such Dispute within said ten (10) days (or such other period as may be agreed to by such Parties) then such Dispute shall be settled by arbitration in Chicago, Illinois by one (1) arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. All discovery and procedural questions shall be governed by the Federal Rules of Procedure and Evidence for the United States District Courts. The proceedings and decision of the arbitrator shall be final, non-appealable, binding and confidential, except as necessary for enforcement of the decision (an "Arbitral Award") which may include

Initialed *JB  CR*

equitable, injunctive and/or monetary relief as well as any other remedy available at law or equity, which may be enforced in any court of competent jurisdiction. The fees of the arbitrator and the costs of arbitration, including the respective legal, accounting, expert and other fees and related expenses incurred by such Parties shall be borne by the Parties to the arbitration in such manner as shall be determined by the arbitrator in the Arbitral Award, whose determination shall also be final and binding on such Parties as to the fees and costs of the arbitration and as to those incurred in any enforcement proceedings in court to enforce the Arbitral Award.

16. **INJUNCTION.** It is agreed that if Cliff violates the terms of this Agreement irreparable harm will occur, and money damages will be insufficient to compensate Nano Gas; and Cliff specifically waives claiming any such response. Therefore, Nano Gas will be entitled to seek injunctive relief (i.e., a court order that requires Cliff to comply with this Agreement) to enforce the terms of this Agreement, without bond or notice, as notice of seeking such injunction could reasonably be expected to precipitate the actions sought to be enjoined.

17. **APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of Illinois, without regard to its laws relating to conflicts of law.


Nano Gas Technologies, Inc.                                      Cliff Roe

By: _____                                     By: _____
Len Bland                                                       Cliff Roe
CEO
Date: 3/21/13                                                   Date: MARCH/21/2013

Acknowledged and Agreed


By: _____
Roxanne Roe

Date: _____


Initialed _____